Exhibit F

CERTIFIED COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

KIM ALLEN, LAINIE RIDEOUT AND )
KATHLEEN HAIRSTON, ON BEHALF )
OF THEMSELVES, ALL OTHERS )
SIMILARLY SITUATED, AND THE )
GENERAL PUBLIC, )
                      )
        Plaintiffs, )
                      )
    vs. )   No. 3:12-cv-376-BTM-BGS
                      )
SIMILASAN CORPORATION, )
                      )
        Defendant. )
                      )

DEPOSITION OF KATHLEEN HAIRSTON

March 14, 2014

Diana L. Porter, CSR No. 12729
372257

BARKLEY
Court Reporters
barkley.com
40 YEARS

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(916) 922-5777 Sacramento     (408) 885-0550 San Jose          (760) 322-2240 Palm Springs    (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills  (212) 808-8500 New York City    (347) 821-4611 Brooklyn        (518) 490-1910 Albany
(516) 277-9494 Garden City     (914) 510-9110 White Plains      (312) 379-5566 Chicago         (702) 366-0500 Las Vegas
           +33 1 70 72 65 26 Paris       +971 4 8137744 Dubai       +852 3693 1522 Hong Kong

1             UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF CALIFORNIA

3

4  KIM ALLEN, LAINIE RIDEOUT AND )
   KATHLEEN HAIRSTON, ON BEHALF  )
5  OF THEMSELVES, ALL OTHERS     )
   SIMILARLY SITUATED, AND THE   )
6  GENERAL PUBLIC,               )
                                 )
7            Plaintiffs,          )
                                 )
8        vs.                     )   No. 3:12-cv-376-BTM-BGS
                                 )
9  SIMILASAN CORPORATION,        )
                                 )
10           Defendant.          )
   _____)

11

12

13         VIDEOTAPED DEPOSITION OF KATHLEEN HAIRSTON,

14  taken on behalf of the defendant, at University of

15  Phoenix, 3110 E. Guasti Road, 3rd Floor, Ontario,

16  commencing at 10:51 a.m., Friday, March 14, 2014, before

17  Diana L. Porter, Certified Shorthand Reporter No. 12729.

18

19

20

21

22

23

24

25

                              2

BARKLEY
Court Reporters

11:30  1          A    Oh, no, sir.

11:30  2          Q    Okay.  No -- nothing involving medicine?

11:30  3          A    No.

11:30  4          Q    Okay.  Anything to do with legal?

11:30  5          A    No, sir.

11:30  6          Q    All right.  Have you purchased homeopathic

11:30  7     products before today?

11:30  8          A    Yes.

11:30  9          Q    All right.  And when did you start doing

11:30  10    that?

11:30  11         A    I don't remember the exact date.

11:30  12         Q    Well, give me a time frame.  Ten years

11:30  13    ago?  Twenty years ago?

11:30  14         A    Oh, no.  No.

11:30  15         Q    How long ago?

11:30  16         A    Maybe within the last three to five years.

11:31  17         Q    And why did you begin to purchase

11:31  18    homeopathic products?

11:31  19         A    Believed they were safer.

11:31  20         Q    And what did you base that belief on?

11:31  21         A    Packaging.

11:31  22         Q    Anything else?

11:31  23         A    Advertising.

11:31  24         Q    When you say --

11:31  25              And advertising.

                                43

BARKLEY
Court Reporters

11:31  1        A     Mm-hmm.

11:31  2        Q     Okay.  So, tell me about safer than what?

11:31  3        A     Traditional over-the-counter medicines.

11:31  4        Q     Was there something that spurred you to

11:31  5   think I'm not happy with traditional

11:31  6   over-the-counter medications, so I need to find

11:31  7   something safer?

11:32  8        A     Not one particular thing.

11:32  9        Q     Well, how about several things?  I mean,

11:32  10  what, if anything?

11:32  11       A     It appeared from the advertising and the

11:32  12  packaging I read that it seemed to be a more

11:32  13  natural, less harmful.

11:32  14       Q     Had you been using over-the-counter

11:32  15  pharmaceuticals before you began purchasing

11:32  16  homeopathic?

11:32  17       A     Yes.

11:32  18       Q     All right.  For what types of conditions

11:32  19  would you buy an over-the-counter pharmaceutical?

11:32  20       A     Allergies.

11:32  21       Q     Now, you were familiar with allergy

11:32  22  medication; correct?

11:32  23       A     Yes.

11:32  24       Q     All right.  So, did you ever -- were you

11:32  25  ever treated by a healthcare professional for an


                                  44

                         KATHLEEN HAIRSTON

11:43  1    products other than the ones we've just --

11:43  2         A    When?

11:43  3         Q    Since the summer of 2013 when the doctors

11:43  4    told you to take -- since the tear-duct-plugs

11:43  5    procedure didn't work --

11:43  6         A    Oh.

11:43  7         Q    -- and then you testified that they told

11:43  8    you to take some over-the-counter products.  Is that

11:44  9    not correct?

11:44  10        A    That's correct.

11:44  11        Q    Okay.  So, did you take any other products

11:44  12   other than Systane, Clear Eyes, GenTeal, Visine, or

11:44  13   Natural Tears?

11:44  14        A    Not that I recall.

11:44  15        Q    All right.  Did you take any homeopathic

11:44  16   products for your dry eyes?

11:44  17        A    When?

11:44  18        Q    Subsequent to the tear -- the

11:44  19   tear-duct-plug procedures not working.

11:44  20        A    No.

11:44  21        Q    All right.  When did you take the

11:44  22   homeopathic product for the dry eye?

11:44  23        A    Prior to 2012.

11:44  24        Q    All right.  And why did you start with the

11:44  25   homeopathic product?

                                58

BARKLEY
Court Reporters

11:44  1        A      Labeling and advertising.

11:44  2        Q      Tell me specifically what did you see on

11:44  3   the label that when you were walking -- let me back

11:44  4   up for a second.

11:44  5            I assume you were in the drugstore.   Is

11:44  6   that a fair assumption?

11:44  7        A      Yes, sir.

11:44  8        Q      And you're walking down the aisle;

11:44  9   correct?

11:44  10       A      Yes, sir.

11:44  11       Q      And you're --

11:44  12            And -- and the aisle in the drugstore has

11:44  13  eye relief or some -- something like that; correct?

11:44  14       A      Yes.

11:44  15       Q      And they have several different types of

11:45  16  packages; correct?

11:45  17       A      Yes.

11:45  18       Q      All right.   And they have --

11:45  19            Did they have the over-the-counter

11:45  20  products that we just discussed like Systane, Clear

11:45  21  Eyes, GenTeal, Visine, Natural Tears?

11:45  22       A      I don't remember.

11:45  23       Q      But they have --

11:45  24            Was it --

11:45  25            So, they had some, some products there?

59

BARKLEY
Court Reporters

11:45  1          A     Yes, sir.

11:45  2          Q     The homeopathics weren't the only

11:45  3   products; correct?

11:45  4          A     Yes, sir.

11:45  5          Q     All right.  So, there were some

11:45  6   over-the-counter products there as well; correct?

11:45  7          A     Yes, sir.

11:45  8          Q     All right.  So, what was it that had you

11:45  9   decide to pick the homeopathic product?

11:45  10         A     The labeling --

11:45  11         Q     Specifically --

11:45  12         A     -- packaging.

11:45  13         Q     I'm sorry.  You said labeling and

11:45  14   packaging?

11:45  15         A     Yes.

11:45  16         Q     What on the label?

11:45  17               MS. MINELLI:  Objection.  Vague and

11:45  18   ambiguous with respect to the specific homeopathic

11:45  19   product that counsel's inquiring about.

11:45  20   BY MR. HERLING:

11:45  21         Q     Which homeopathic product -- were there

11:45  22   more than one?

11:45  23         A     Not that I recall.

11:45  24         Q     There was only one product?

11:45  25               MS. MINELLI:  Same objection.

KATHLEEN HAIRSTON

BARKLEY
Court Reporters

11:45    1    BY MR. HERLING:

11:45    2         Q    Only one homeopathic product on the shelf

11:45    3    relating to dry eye?

11:45    4         A    Not that I re- --

11:46    5              I don't remember.

11:46    6         Q    All right.  So, you don't remember if

11:46    7    there was more than one.  Well, let me ask you this:

11:46    8    Do you remember if there was Similasan on the -- on

11:46    9    the shelf?

11:46   10         A    Yes, sir.

11:46   11         Q    Why do you remember that?

11:46   12         A    The packaging.

11:46   13         Q    And what was it in the packaging that you

11:46   14    recall?

11:46   15         A    Or labeling, excuse me.

11:46   16         Q    Yeah.  What was --

11:46   17         A    Or packaging, I'm sorry, the outside box,

11:46   18    packaging.

11:46   19         Q    Okay.  What was it that you don't remember

11:46   20    anything but you remember this?  What was it about

11:46   21    it that made you remember this?

11:46   22         A    Physician-recommended.

11:46   23         Q    Okay.

11:46   24         A    Sa- -- homeopathic, safer.

11:46   25         Q    It said safer on the label?

61

KATHLEEN HAIRSTON

BARKLEY
Court Reporters

11:46 1        A      Maybe not that exact word, but

11:46 2    homeopathic, physician-recommended --

11:46 3        Q      Okay.

11:46 4        A      -- relief.

11:46 5        Q      Okay.  Did --

11:46 6               Was there another homeopathic product that

11:46 7    had a label that said those things?

11:46 8        A      Not that I recall.

11:46 9        Q      You don't recall?

11:46 10       A      I don't recall.

11:46 11       Q      All right.  So, you recall Similasan?

11:46 12       A      Yes, sir.

11:46 13       Q      When did you first purchase a Similasan

11:46 14   product?

11:46 15       A      I don't remember the exact dates.

11:46 16       Q      Well, give me a general time frame.

11:46 17   You've already told me it's before you went to get

11:47 18   tear-duct-plug procedure; correct?

11:47 19       A      Yes, sir.

11:47 20       Q      All right.  So, did you read the label?

11:47 21       A      Yes, sir.

11:47 22       Q      You read it very closely?

11:47 23       A      Or the packaging.

11:47 24       Q      The packaging?

11:47 25       A      The la- -- the box.

62

BARKLEY
Court Reporters

11:57  1            MS. MINELLI:  Okay.

11:57  2            MR. HERLING:  Did she not verify these?

11:57  3            MS. MINELLI:  Oh, I actually have

11:57  4  verifications.

11:57  5            MR. HERLING:  Okay.

11:57  6            MS. MINELLI:  She did sign them.  We just

11:57  7  haven't gotten them to your office yet.

11:57  8            MR. HERLING:  Fine.  So, if I asked her

11:57  9  that she signed them under oath --

11:57  10           MS. MINELLI:  Yes.

11:57  11           MR. HERLING:  -- you're not going to

11:57  12  object because it's not here?  Okay.

11:57  13       Q    Have you taken a look at these?

11:57  14       A    Briefly.

11:57  15       Q    Okay.  Do you remember responding to these

11:57  16  questions?

11:57  17       A    Generally, yes.

11:57  18       Q    Okay.  All right.  Take a look at

11:57  19  Interrogatory Number 1.

11:57  20       A    Uh-huh.

11:57  21       Q    And the question, in essence, is when did

11:57  22  you buy the products.

11:57  23       A    Mm-hmm.

11:57  24       Q    And it says starting in or around 2009,

11:58  25  and continuing until 2010, you purchased the

                            74

BARKLEY
Court Reporters

11:58 1    products as needed, approximately two times per

11:58 2    year, once in March or April and once in September

11:58 3    or October.  Plaintiff typically purchased the

11:58 4    products at Target and/or at Vons stores.  Did I

11:58 5    read that correctly?

11:58 6         A    Yes, sir.

11:58 7         Q    All right.  Is that -- is that answer

11:58 8    accurate?

11:58 9         A    Yes, sir.

11:58 10        Q    All right.  So, you --

11:58 11             Does that refresh your memory now that you

11:58 12   began purchasing the Similasan products in '09

11:58 13   through 2010?

11:58 14        A    Yes, sir.

11:58 15        Q    Did you purchase any products after 2010?

11:58 16             MS. MINELLI:  Objection.  Vague and

11:58 17   ambiguous with respect to the term products.

11:58 18   BY MR. HERLING:

11:58 19        Q    Well, since the interrogatories define it,

11:58 20   I would assume that we all were using that as the

11:58 21   definition.  But if you want me to read it, we can

11:58 22   do that.  But we can go through it.  We'll go

11:58 23   through each and every product.

11:58 24             So, you purchased allergy relief; is that

11:58 25   right?

BARKLEY
Court Reporters

13:26  1        Q      Okay.  And when did you determine that the

13:26  2   product didn't perform?

13:26  3        A      After I used it.

13:26  4        Q      The first time?

13:26  5        A      I don't recall.

13:26  6        Q      Well, you bought it in 2009?

13:26  7        A      Mm-hmm.

13:27  8        Q      And you used it in March and April?

13:27  9        A      Right.

13:27  10       Q      And you said it didn't perform; is that

13:27  11  right?

13:27  12       A      Yes.

13:27  13       Q      None of the products provided any relief

13:27  14  at all?

13:27  15       A      I don't recall.

13:27  16       Q      All right.  What's your definition of

13:27  17  didn't perform?

13:27  18       A      Based upon the labeling and packaging, I

13:27  19  relied upon that.

13:27  20       Q      Well, let's go through that, then.  Pull

13:27  21  out -- let's go to --

13:27  22       A      Okay.

13:27  23       Q      -- 6.  All right.  These were the labels

13:27  24  that were in existence in April of two -- during the

13:27  25  period of time you brought the product?

153

KATHLEEN HAIRSTON

BARKLEY
Court Reporters

13:27  1          A     Yes, sir.

13:27  2          Q     And 6A is Allergy Eye Relief?

13:27  3          A     Mm-hmm.

13:27  4          Q     What didn't perform?  What -- how did the

13:27  5  product not perform?

13:28  6          A     Relieving the symptoms that are listed on

13:28  7  here.

13:28  8          Q     The itching burning and --

13:28  9          A     Watering.

13:28 10          Q     -- watering --

13:28 11          A     Mm-hmm.

13:28 12          Q     -- associated with allergies?

13:28 13          A     Mm-hmm.

13:28 14          Q     Okay.  And so it didn't work when you

13:28 15  bought it in '09 in March or April; right?

13:28 16          A     To my best recollection.

13:28 17          Q     And then, you bought it again in September

13:28 18  and October?

13:28 19          A     As I -- my best recollection.

13:28 20          Q     Why did you buy something that didn't work

13:28 21  the first time?

13:28 22          A     I may not have used the entire bottle.  I

13:28 23  stated my husband used some of it, too.

13:28 24          Q     So, you thought maybe you didn't follow

13:28 25  the directions properly?

154

KATHLEEN HAIRSTON

BARKLEY
Court Reporters

13:28  1            MS. MINELLI:  Misstates testimony.

13:28  2   BY MR. HERLING:

13:28  3        Q     I'm asking a different question.

13:28  4        A     Pardon?

13:28  5        Q     Did you think you didn't follow the

13:28  6   directions properly and that's why it didn't work?

13:28  7        A     No.

13:28  8        Q     So -- so what is it about not using the

13:28  9   entire bottle?  Does it say anywhere on here you're

13:29  10  supposed to use it, use the entire bolts?

13:29  11       A     No.

13:29  12       Q     All right.

13:29  13       A     Not to my knowledge.

13:29  14       Q     Oh.  And, in fact, doesn't it say that

13:29  15  stop use and ask a doctor if the symptoms persist

13:29  16  more than 72 hours?

13:29  17       A     Yes, sir.

13:29  18       Q     Did you use it for more than 72 hours?

13:29  19       A     I don't recall.

13:29  20       Q     So, it didn't work in March 2009.  So,

13:29  21  then, you bought it again in September of 2009; is

13:29  22  that correct?

13:29  23       A     Yes.

13:29  24       Q     All right.  Did it work then?

13:29  25       A     No.

155

KATHLEEN HAIRSTON

BARKLEY
Court Reporters

13:29  1        Q    All right.  And do you have any
13:29  2   idea -- well, strike that.
13:29  3            And then, you waited.  March of 2010 --
13:29  4   correct? -- you bought it again?
13:29  5        A    Yes, sir.
13:29  6        Q    Okay.  So, why did you buy a product that
13:29  7   didn't work twice now?
13:29  8        A    I don't know how many times I bought the
13:29  9   product, as I stated earlier.
13:29  10       Q    Well, ma'am, I'm sorry, but your
13:29  11  interrogatory doesn't say that.  Your interrogatory
13:29  12  says under oath -- and this is all I can go on -- is
13:30  13  that you bought it approximately two times a year
13:30  14  for --
13:30  15            MS. MINELLI:  She bought the products,
13:30  16  plural, and the products, plural, as defined in
13:30  17  these interrogatories.
13:30  18  BY MR. HERLING:
13:30  19       Q    Oh, all right.  So -- so, in other words,
13:30  20  you're --
13:30  21            Well, I'm going to go through all -- well,
13:30  22  strike that.
13:30  23            You don't remember --
13:30  24            Well, put it this way.  Did you buy the
13:30  25  Allergy Eye Relief more than once?

KATHLEEN HAIRSTON

BARKLEY
Court Reporters

13:30  1          A     I don't recall.

13:30  2          Q     All right.  And you didn't used the entire

13:30  3   bottle?

13:30  4          A     I may not have.

13:30  5          Q     All right.  And the symptoms persisted for

13:30  6   more than 72 hours?

13:30  7          A     I don't recall.

13:30  8          Q     Well, they didn't go away, did they, your

13:30  9   symptoms?

13:30  10         MS. MINELLI:  Vague and ambiguous with

13:30  11  respect to the time frame of the question.

13:30  12  BY MR. HERLING:

13:30  13         Q     Well, all right.  You purchased a product.

13:30  14  You used it.  And the symptoms persisted for more

13:30  15  than 72 hours; is that not correct?

13:30  16         MS. MINELLI:  Assumes -- misstates

13:30  17  client's testimony.

13:30  18  BY MR. HERLING:

13:30  19         Q     Well, then it worked?

13:30  20         MS. MINELLI:  Assumes facts.

13:30  21         THE DEPONENT:  I don't recall.

13:30  22  BY MR. HERLING:

13:30  23         Q     Well, the symptoms either persisted or

13:30  24  they resolved.  Isn't that fair?  They don't -- it's

13:31  25  one way or the other.

157

13:31  1              MS. MINELLI:  You can answer.

13:31  2              Vague and ambiguous with respect to the --

13:31  3      the time frame of the question.

13:31  4      BY MR. HERLING:

13:31  5          Q    When you bought the product in '09, I

13:31  6      assume, or 2010, you --

13:31  7              So, you're telling me you don't know

13:31  8      whether you bought this product in '09 or 2010; is

13:31  9      that right?

13:31  10         A    That's correct.

13:31  11         Q    Okay.  But you know it didn't work; right?

13:31  12         A    That's correct.

13:31  13         Q    And did you use it for more than 72 hours?

13:31  14         A    I don't remember.

13:31  15         Q    Well, then, how did you know it didn't

13:31  16     work?

13:31  17             MS. MINELLI:  Objection to the extent this

13:31  18     question is vague, ambiguous with respect to the

13:31  19     time frame of the knowledge within which you're

13:31  20     inquiring about from my client.

13:31  21     BY MR. HERLING:

13:31  22         Q    Well, at some point, you decided to bring

13:31  23     a lawsuit; correct?

13:31  24         A    Yes.

13:31  25         Q    And at some point, you decided to sue my

                                158

BARKLEY
Court Reporters

```
13:43   1    supposed to be working.  Inactive is probably the
13:43   2    solution or however they're -- they're -- get into
13:43   3    to your body or however they're going to get to you.
13:43   4         Q    Okay.
13:43   5         A    So --
13:43   6         Q    So, you knew the difference when you
13:43   7    bought this?
13:43   8         A    Yeah.
13:43   9         Q    Okay.  By the way, I didn't ask you this.
13:43   10   Do you have in your mind what homeopathy is,
13:43   11   homeopathic medication?
13:43   12        A    It just --
13:43   13             Do I know the definition?
13:43   14        Q    Well, or, yeah, just what you understand
13:43   15   it to be.
13:43   16        A    I --
13:43   17             To me it sounds alternative medicine,
13:43   18   safe, chemical-free.
13:44   19        Q    Okay.  Why do you say it's safe?  What do
13:44   20   you base that on.
13:44   21        A    That, well, that the word homeo means the
13:44   22   same.  So I -- would lead me to believe that it's --
13:44   23   it's the same.
13:44   24        Q    The same as --
13:44   25        A    Maybe whatever's in your body or --
```

168

BARKLEY
Court Reporters

1          DEPOSITION OFFICER'S CERTIFICATE

2

3     STATE OF CALIFORNIA     }
                              }     ss.
4     COUNTY OF LOS ANGELES   }

5

6          I, Diana Porter      , hereby certify:

7          I am a duly qualified Certified Shorthand

8     Reporter in the State of California, holder of

9     Certificate Number CSR 12729    issued by the Court

10    Reporters Board of California and which is in full force

11    and effect.  (Fed. R. Civ. P. 28(a)).

12         I am authorized to administer oaths or

13    affirmations pursuant to California Code of Civil

14    Procedure, Section 2093(b) and prior to being examined,

15    the witness was first duly sworn by me.  (Fed. R. Civ.

16    P. 28(a), 30(f)(1)).

17         I am not a relative or employee or attorney or

18    counsel of any of the parties, nor am I a relative or

19    employee of such attorney or counsel, nor am I

20    financially interested in this action.  (Fed. R. Civ. P.

21    28).

22         I am the deposition officer that

23    stenographically recorded the testimony in the foregoing

24    deposition and the foregoing transcript is a true record

25                         / / /

                           184

1  of the testimony given by the witness.   (Fed. R. Civ. P.

2  30(f)(1)).

3        Before completion of the deposition, review of

4  the transcript [   ] was [XX] was not requested.   If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.   (Fed. R. Civ. P. 30(e)).

8

9  Dated: _____MAR 2 8 2014_____,

10

11                _Diana L Porto_____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

185

BARKLEY
Court Reporters